UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES FOR USE OF
DEEPALI CO., LLC,

    Plaintiff,                                            Case No. 17-12911

v.                                                       HON. GEORGE CARAM STEEH

FUTURENET GROUP, INC., and
WESTERN SURETY COMPANY,

    Defendants.
_____/

OPINION AND ORDER GRANTING WESTERN'S
MOTION FOR SUMMARY JUDGMENT (Doc. 37) AND DENYING
DEEPALI'S MOTION FOR SUMMARY JUDGMENT (Doc. 24)

This matter comes before the court on the parties' cross-motions for summary judgment, which have been extensively briefed. The court heard oral argument on March 11, 2019, and took the motions under advisement.

BACKGROUND FACTS

This case involves the construction of the visitor center at the Detroit River International Wildlife Refuge in Trenton, Michigan. The visitor center project was initiated by the United States Department of Interior, Fish and Wildlife Service. Defendant FutureNet Group, Inc., was the general contractor for the project and obtained payment and performance bonds

- 1 -

from Defendant Western Surety Company. Plaintiff Deepali Co., LLC, a subcontractor, alleges that it was not paid for labor and materials it provided for the project. Deepali alleges that Western is liable to it in the amount of $320,751.54 under its contract with FutureNet and the payment bond.[1]

In September 2013, FutureNet entered into its contract with the U.S. Fish and Wildlife Service ("USFWS") to construct the visitor center project, with a completion date of December 18, 2016. As required by law, FutureNet obtained payment and performance bonds from Western. In early 2015, Western began receiving claims against the payment bond. According to Western, FutureNet had been receiving payments from USFWS but had not been paying its subcontractors. USFWS agreed to allow FutureNet to continue as the general contractor, but began submitting payments to an escrow account, to be disbursed to subcontractors by Western at FutureNet's direction.

In December 2015, FutureNet and Deepali entered into a subcontract agreement in the amount of $44,252 for the insulation work. *See* Doc. 24-3. The master agreement provided that Deepali shall comply with the Davis-Bacon Act, including by paying its employees and subcontractors the

---

[1] This action is stayed as to FutureNet, which is under receivership in state court.

locally prevailing wage rate and fringe benefits. *Id.* at ¶ 6.  Deepali was to maintain payroll records and provide certified payroll records to the project manager on a monthly basis. *Id.* at ¶ 7.  The contract provided a "no-escalation" clause: "[FutureNet] shall not be required to pay Subcontractor any increased cost for 'escalation' of material or escalated procurement costs." *Id.* at ¶ 11.  Change orders "are only executed if a modification from the Government Client has been provided to [FutureNet]." *Id.* at ¶ 26.  Deepali further agreed that "the price awarded in the Scope Review Checklist is a firm-fixed price and will not be adjusted unless a corresponding Government Modification exists." *Id.*  The subcontract permitted FutureNet to terminate the agreement "for its convenience." *Id.* at ¶ 30.1.  "In such event, Subcontractor will be entitled to compensation for services properly performed up to the date of termination." *Id.*

Subsequently, FutureNet and Deepali executed seven change orders that substantially expanded the scope of the work and the contract price. Each change order provided that all the terms of the original agreement "shall remain in full force and effect with the exception of the changes expressly provided for herein." *See* Docs. 24-4 - 24-10.  Change Order 1, dated December 24, 2015, is for the acoustic ceiling work in the amount of

$23,500. Doc. 24-4. Change Order 2, dated April 28, 2016, is for the installation of a vapor barrier, in the amount of $97,023. Doc. 24-5. Change Order 3, dated June 10, 2016, is for the installation of drywall, for an additional cost of $193,753. Doc. 24-6. Change Order 4, dated September 12, 2016, is for the installation of a shade system, flag pole, fireplace, and exterior sign, in the amount of $29,572. Doc. 24-7. Change Order 5, dated September 21, 2016, is for rough carpentry/framing work, in the amount of $60,350.05. Doc. 24-8. Change Order 6, dated September 30, 2016, provides for an additional $39,949.26 for "Equipment & Materials" and $120,922.51 for "Additional Labor." Doc. 24-9. Change Order 7, dated January 9, 2017, is an "Addition for Department of Labor Wage [claim]: $98,812.00." Doc. 24-10. Deepali alleges that the total contract price, including the change orders, amounts to $640,381.82.

According to Deepali, it began working on the project in May 2016, and last furnished labor and/or materials on September 22, 2016. During this time, at FutureNet's direction, Western made payments from the escrow account to Deepali and its subcontractors.

On December 13, 2016, Deepali submitted a claim to Western against the payment bond. In support, Deepali attached its subcontract and Change Orders 1-5. Deepali claimed $124,481.02 for work performed

through September 2016. Western acknowledged receipt of the claim and requested additional information and documentation from Deepali. Western noted that Deepali and/or its subcontractors had already been paid a total of $314,635.67, which Western believed exceeded Deepali's claim. Doc. 38-27. According to Western, Deepali did not provide the documentation requested, but sent emails seeking immediate payment.

Meanwhile, Deepali sought additional change orders from FutureNet after September 2016, when it last performed work on the project. On October 6, 2016, Deepali sent an email to FutureNet, seeking a change order because it "spent more than contract amount on Drywall project." Doc. 38-37. Deepali provided FutureNet some documentation and a summary of its calculations in January and February 2017. *See* Doc. 38-40, 38-41. Subsequently, FutureNet agreed to Change Order 6, which seeks $39,949.26 for "Equipment & Materials" and $120,922.51 for "Additional Labor." Doc. 24-9. Deepali claims that FutureNet calculated these figures, while FutureNet representatives could not explain how the parties arrived at the numbers. Doc. 38-2 at 93-94; Doc. 38-4 at 71-72; Doc. 38-5 at 57, 108-110. Deepali's documentation supporting Change Order 6 adds up to only $63,099.84, rather the total amount of Change

Order 6 ($160,871.77).[2] Docs. 38-40, 44-3. Although Change Order 6 was issued in March or April 2017, it was backdated to September 30, 2016. Doc. 38-2 at 62.

Around the same time, Deepali also obtained Change Order 7, dated January 9, 2017, which adds $98,812 to the contract price for "Department of Labor Wage [claim]." Doc. 24-10. The Department of Labor ("DOL") had investigated Deepali in 2016 for failing to pay its workers the prevailing wage. The DOL assessed Deepali in the amount of $98,812. Western paid this amount to the DOL on behalf of Deepali, in exchange for a waiver executed by Deepali. In signing the waiver, Deepali agreed that "the funds paid to Wage and Hours Division of the Department of Labor have reduced any amount which may be owed to Deepali Company, now or in the future, by the amount of $98,812.09 taken to pay the backwages owed to its individual employees." Doc. 37-35. Deepali waived its rights against Western in the amount of $98,812.09 and directed Western to pay $98,876.73 to the DOL "to satisfy Deepali's obligations to DOL and Deepali's laborers/employees for unpaid wages and/or benefits." Doc. 37-36.

---

[2] Deepali's documentation related to Change Orders 3 and 6 totals $254,516.53 and is not segregated by change order. Doc. 41-26. *See also* Doc. 41-20.

Deepali's owner, Dharmen Patel, testified that he signed the waiver because FutureNet told him that it would give him a change order for the amount Western paid the DOL. Doc. 38-2 ("We going to give you a change order, so don't fight, for we want DOL off the back as soon as possible."). FutureNet agreed to a change order because "this money is over the amount that [Deepali] estimated to perform the work." Doc. 38-5 at 125-27. At the time FutureNet agreed to Change Orders 6 and 7, the project was "underwater" and FutureNet knew that Deepali would seek these payments from Western, not FutureNet. FutureNet agreed that Change Order 7 essentially reflected a request that Western incur the penalty for Deepali's failure to pay the prevailing wage, as required by statute and its contract. *Id.* On May 10, 2017, Deepali submitted a new claim against the payment bond, asserting that it was now owed $327,555.47, although it had not done any additional work on the project since September 2016. With this claim, Deepali sought payment for Change Orders 6 and 7. Doc. 38-43. Western responded by refusing to pay Change Order 7, which it found was an attempt to "compensate Deepali Co., Inc. for its own failure to pay its own laborers." Doc. 38-44. Western sought additional detailed information about Change Order 6, noting that there was no documentation supporting the proposition that Deepali completed work on the project in

2017, and that Change Order 6 was not supported by a detailed breakdown of the labor and materials allegedly supplied. Doc. 38-45. Deepali did not provide the information requested by Western, but referred Western to its accountant. Deepali's accountant, however, did not have any information regarding the project. Docs. 38-48 - 38-51.

On May 12, 2017, USFWS declared FutureNet to be in default and terminated the contract. FutureNet terminated Deepali's subcontract "for convenience" on May 18, 2017. On July 21, 2017, Western took over the project pursuant to a demand by USFWS on the performance bond. Western hired John DeMattia Construction as its completion contractor. DeMattia continues to work on the project, which remains unfinished to date.

Deepali received payments from FutureNet and/or Western in the amount of $319,630.28. Deepali alleges that it is owed $320,751.54. Western contends that Deepali has failed to substantiate its claims under some of the change orders, obtained change orders through fraud and collusion with FutureNet, and provided substandard work that has not been accepted by USFWS. According to Western, DeMattia has incurred costs to complete or repair Deepali's work, which may not be accepted by USFWS and may need to be redone. Western asserts that a final

accounting of backcharges against Deepali is premature.

## LAW AND ANALYSIS

I. Standard of Review

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When reviewing a motion for summary judgment, the court views the facts, and any reasonable inferences drawn from the facts, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The party opposing summary judgment, however, must present more than a "mere scintilla" of evidence; the evidence must be such that a reasonable jury could find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

II. The Miller Act

The Miller Act requires a general contractor on a federal construction project to furnish a payment bond "for the protection of all persons supplying labor and material in carrying out the work provided for in the contract." 40 U.S.C. § 3131(b)(2). "The Miller Act represents a congressional effort to protect persons supplying labor and material for the

construction of federal public buildings. . . . The essence of its policy is to provide a surety who, by force of the Act, must make good the obligations of a defaulting contractor to his suppliers of labor and material." *U.S. for Benefit & on Behalf of Sherman v. Carter*, 353 U.S. 210, 216-17 (1957). *See also Technica LLC ex rel. U.S. v. Carolina Cas. Ins. Co.*, 749 F.3d 1149, 1152 (9th Cir. 2014). The Act provides that a person who has furnished labor or material on bonded federal construction project and that has not been paid in full within 90 days "may bring a civil action on the payment bond." 40 U.S.C. § 3133(b)(1).

To state a valid Miller Act claim, a subcontractor "must prove essentially two elements: (1) it has 'furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131'; and (2) it 'has not been paid in full within 90 days.'" *United States for Use & Benefit of Am. Civil Constr., LLC v. Hirani Engin. & Land Surveying, P.C.*, 345 F. Supp. 3d 11, 39-40 (D.D.C. 2018) (citation omitted). "A surety's liability under the Miller Act is measured by the general contractor's liability under the construction contract." *Consol. Elec. & Mechanicals, Inc. v. Biggs Gen. Contracting, Inc.*, 167 F.3d 432, 435 (8th Cir. 1999). "Because it is a 'cardinal rule of the surety/principal relationship that a surety occupies the shoes of its principal,' in general, the

surety's liability on the payment bond is 'defined by the liability of the underlying contract.'" *United States v. Hartford Accident & Indem. Co.*, 168 F. Supp. 3d 824, 832 (D. Md. 2016) (citations omitted). "In other words . . . the surety on a Miller Act payment bond is liable only to the extent that the general contractor would be liable – and the surety may avail itself of most contract defenses, including the doctrines of release and waiver." *Id.* State law governs the interpretation of contracts under the Miller Act, to which the United States is not a party. *U.S. for use of Kasler Elec. Co. v. Ins. Co. of N. Am.*, 963 F.2d 374 (6th Cir. 1992) (citing *U.S. ex rel. Leno v. Summit Constr. Co.*, 892 F.2d 788, 792 (9th Cir. 1989)).

III. Western's Motion for Summary Judgment

Western seeks summary judgment in its favor, arguing that Change Orders 6 and 7, as well as Deepali's final pay application, are invalid and unenforceable as a matter of law.

A. Change Order 7

Change Order 7 adds $98,812 to the contract price for the "Department of Labor Wage [claim]." Doc. 24-10. The Department of Labor investigated Deepali for failing to pay prevailing wages to twenty-five workers while it was on the project. The DOL assessed Deepali in the amount of $98,876.73 for unpaid wages. Doc. 37-33. Because neither

Deepali nor FutureNet paid the assessment, DOL sought payment against the bond from Western. Western agreed to pay the assessment, on the condition that any amount owed to Deepali under the subcontract would be reduced by the amount paid for the DOL assessment. Doc. 37-34. Deepali signed a waiver to that effect, agreeing that "the funds paid to Wage and Hours Division of the Department of Labor have reduced any amount which may be owed to Deepali Company, now or in the future, by the amount of $98,812.09 taken to pay the backwages owed to its individual employees." Doc. 37-35. Deepali waived its rights against Western in the amount of $98,812.09 and directed Western to pay $98,876.73 to the DOL "to satisfy Deepali's obligations to DOL and Deepali's laborers/employees for unpaid wages and/or benefits." Doc. 37-36. (The difference in the numbers is apparently the result of a calculation error by the DOL. Doc. 37-41).

Western contends that Change Order 7 is the product of fraud and collusion between FutureNet and Deepali. The circumstances certainly support such an inference. The court need not make a finding regarding fraud and collusion, however, given Deepali's unambiguous waiver of the $98,812.09 payment. Indeed, Deepali makes no attempt to justify its alleged entitlement to Change Order 7 or dispute its waiver. Rather,

Deepali unconvincingly contends that "Change Order No. 7 has been paid" and that because the change order was signed by FutureNet, "it represents a part of Deepali's total contract value." Doc. 41 at 14.

The evidence demonstrates, however, that Western did not pay Deepali for Change Order 7, which was issued after Western paid the DOL and after Deepali signed the waivers. Any payment Deepali attempts to attribute to Change Order 7 was for other change orders. Contrary to Deepali's argument, it is "double dipping": not only did Western pay Deepali's obligation to the DOL, Deepali is seeking $98,812 from Western for wages that it should have, but did not, pay its workers under the contract. Because the DOL made these workers whole, any payment for Change Order 7 would represent a windfall for Deepali.

Based upon the unambiguous waivers that Deepali signed, it is not entitled to payment for the $98,812 Western paid the DOL. *See Beck v. Park W. Galleries, Inc.*, 499 Mich. 40, 46 (2016) ("We must interpret and enforce clear and unambiguous language as it is written."). As a clear attempt to circumvent the waivers, Change Order 7 is not enforceable as a matter of law.

B.  Change Order 6

Change Order 6 does not specify the scope of the work to be

completed; rather, without further explanation, it provides: "Equipment & Materials = $39,949.26" and "Additional Labor on T & M = $120,922.51." Doc. 24-9. Deepali sought the change order because it "spent more than contract amount on [the] Drywall project." Doc. 37-44. Western contends that Deepali was not entitled to seek additional money for drywall because the original price, set forth in Change Order 3, was for the fixed amount of $193,753. Doc. 24-6. Change Order 3 provides that "additional cost for this additional work is $193,753." *See also* Doc. 38-17 (Deepali's $193,753 drywall bid for "supervision, materials, and all the labor necessary for the completion of Drywall Installation"). Although Deepali claims that Change Order 3 represented an agreement to pay based upon a "time and materials" rate rather than a fixed price, Change Order 3 does not contain a "time and materials" term. Further, Change Order 3 specifically states that "[a]ll terms" of the original subcontract "shall apply and remain in full force and effect." Doc. 24-6. The original subcontract was for a fixed price, and this term remained in effect. *See* Doc. 24-3 at ¶¶ 11, 26.

Based upon the clear terms of the contract, Deepali was not entitled to seek a change order because its drywall costs were more than expected. Pursuant to Change Order 3, Deepali was to furnish and install the drywall for $193,753. To the extent Change Order 6 seeks to

compensate Deepali for unexpected or increased costs for drywall, it fails for a lack of consideration. "Under the preexisting duty rule, it is well settled that doing what one is legally bound to do is not consideration for a new promise. This rule bars the modification of an existing contractual relationship when the purported consideration for the modification consists of the performance or promise to perform that which one party was already required to do under the terms of the existing agreement." *Yerkovich v. AAA,* 461 Mich. 732, 740-41 (2000).

Deepali contends that in addition to drywall, Change Order 6 covered other "miscellaneous tasks," such as cleaning and exterior sealing and caulking. Deepali provides no evidence whatsoever, such as payroll records or itemized receipts, that any costs sought in Change Order 6 are attributable to cleaning, sealing and caulking, or any other task. Deepali's documentation provides no basis to distinguish between alleged costs for drywall and costs for other "miscellaneous tasks." For example, rather than provide payroll records that identify the hours worked on any particular task, Deepali has provided cancelled checks made payable to various individuals, with no indication of the hours worked, the pay rate, or the

specific tasks completed.[3] Deepali's principal was also unable to explain what portion of Change Order 6 covered drywall or other tasks. Doc. 38-2 at 62-63, 93-94.

In addition, the documentation Deepali has provided in support of Change Order 6 simply does not add up. Although Deepali seeks $160,871.77 for Change Order 6, it is not provided support for this figure and has been unable to articulate how it arrived at this number. Deepali's documentation supporting Change Order 6 adds up to only $63,099.84, while suffering from the lack of specificity described above.[4] *See* Docs. 38-40, 44-3. Deepali's claim that Change Order 6 covers items other than increased costs for drywall is unsupported. In addition to failing for a lack of consideration, Change Order 6 is not payable because Deepali is unable to provide the basic support required to sustain its claim under the bond.

C. Pay Application 7

Western also challenges Deepali's final pay application (Pay

---

[3] The contract required Deepali to submit certified payrolls on a monthly basis, as required by the Davis-Bacon Act. Doc. 24-3 at ¶¶ 6, 7. There is no evidence Deepali complied with this provision.
[4] Deepali also relies on a summary purporting to identify $254,516.53 in costs for Change Orders 3 and 6. *See* Doc. 41-26. Subtracting $193,753 for Change Order 3, the amount attributable to Change Order 6 is $60,763.53. Yet another summary allegedly supporting its calculations for drywall includes items that are clearly not chargeable against the bond, including the $98,812 paid to the DOL by Western and $58,000 in "insurance payments." Doc.38-41.

Application 7), dated March 31, 2017, as untimely. Under the subcontract, the final invoice must be submitted no later than 60 days after the completion of the work. "Subcontractor is required to submit the final invoice under this Agreement not later than sixty (60) days after completion of the work required by the Task Order. Any invoices received after that time will not be paid by the Company." Doc. 24-3 at ¶ 12.1.

Deepali last worked on the project in September 2016. Deepali contends, however, that it requested change orders from FutureNet within the 60-day period (October 6, 2016), but it took FutureNet until March 2017 to provide the signed change orders. Deepali asserts that once it received the change orders, it promptly submitted its final invoice.

Pay Application 7 seeks payment for Change Orders 6 and 7, as well as $29,062.95 under Change Order 3 for drywall. Deepali has provided an explanation for its delay in seeking payment for Change Orders 6 and 7, because it was awaiting approval from FutureNet. Having already decided that these change orders are not valid, the court need not consider whether the accompanying request for payment was timely.

Deepali does not explain, however, why Pay Application 7 included a delayed request for payment ($29,062.95) under Change Order 3 for drywall. Deepali's Pay Application 5, dated September 30, 2016, stated

that the drywall was 85% complete, as did Pay Application 6, which was dated November 30, 2016. Doc. 38-43 at PageID 2695-97. Deepali never returned to the project after September 30, 2016. Nonetheless, Pay Application 7 represents that the drywall was 100% complete and seeks the balance under Change Order 3 ($29,062.95). Deepali does not explain how it completed the drywall between November 2016 and March 2017, when it was last present at the job site in September 2016. The last date Deepali could have completed its work under the contract was in September 2016, and it did not submit its final pay application until months later. Deepali does not attempt to argue that its request for $29,062.95 in Pay Application 7 was timely. Accordingly, the court finds that this portion of Pay Application 7 is untimely and not payable under the contract.

   II. <u>Deepali's Motion for Summary Judgment</u>

Deepali seeks summary judgment on its claim against Western under the payment bond. As discussed above, several portions of Deepali's claim are not payable or unsupported. Further, Western has submitted evidence that it is continuing to repair Deepali's allegedly poor-quality workmanship and that the drywall has required repairs that have yet to be accepted by USFWS. Accordingly, any amount that Western may be entitled to backcharge against Deepali has yet to be determined. Given

the issues raised by Western, Deepali is not entitled to summary judgment on its Miller Act/payment bond claims.

CONCLUSION

IT IS HEREBY ORDERED that Western's motion for summary judgment (Doc. 37) is GRANTED and Deepali's motion for summary judgment (Doc. 24) is DENIED, consistent with this opinion and order.

Dated: March 19, 2019

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
March 19, 2019, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk